

# NUMBER 13-19-00178-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF
## M.R., R.R., P.R., C.R., B.R., M.R., M.H., CHILDREN

## On appeal from the 36th District Court
## of Bee County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Contreras and Justices Hinojosa and Tijerina
### Memorandum Opinion by Justice Hinojosa

In this parental termination case, appellant N.H.[1] challenges the termination of his

parental rights to his daughters M.R., a three-year-old, and M.H., a two-year-old. By

three issues, N.H. challenges: (1) the legal and factual sufficiency of the evidence

---

[1] Pursuant to Texas Rule of Appellate Procedure 9.8, we use aliases or initials to protect the identity of minors in parental termination cases. *See* TEX. R. APP. P. 9.8. We extend the use of aliases or initials to any related adults whose known identities might jeopardize the minors' privacy. *See id.*

supporting a finding that it was in the best interests of his children to terminate the parent-child relationship; (2) the legal and factual sufficiency of the evidence supporting termination under Texas Family Code § 161.001(b)(1)(D), (E), (F), (N), and/or (O); and (3) whether he received effective assistance of counsel. We affirm.

## I. BACKGROUND

N.H. and D.R. are the father and mother, respectively, of M.R and M.H.[2] In July of 2017, Family Based Safety Services (FBSS), a division of the Texas Department of Family and Protective Services (the Department), opened a case in Goliad County, Texas after receiving reports regarding possible neglect.

### A. Testimony from Department Employees

Rebecca Villarreal, an FBSS worker, testified at the permanency trial. She stated that M.R. and M.H. were referred to her local office for services when their mother, D.R., moved to Beeville, Texas in October 2017.[3] While assisting this family, Villarreal learned that D.R. refused to let N.H. visit his daughters because of previous allegations of domestic abuse. Villarreal also testified that N.H. had not been paying child support, and he repeatedly refused to let the Department know the address of where he was living. The Department offered parenting and domestic violence education services to N.H., but he refused them all.

---

[2] The case style also mentions children M.R., R.R., P.R., C.R., and B.R. These are D.R.'s children from a prior relationship. Their custody is not at issue in this appeal, as the court awarded full custodial rights to their father.

[3] The jury terminated D.R.'s parental rights, as well. Because D.R. has not appealed this judgment, we focus on the testimony and evidence regarding the termination of N.H.'s rights. *See id*. R. 47.1.

After three months of attempted services, a court appointed the Department as temporary managing conservator of the girls on January 3, 2018. The impetus for removing the girls from their mother's home was that they were arriving to daycare unwashed, in soiled clothing, and M.H.'s vaginal area had a "foul odor" even after daycare employees changed her diaper. M.R. and M.H. were put into a foster placement due to this neglect. The Department did not consider placing them with their father because it did not know if he could provide a safe and stable living environment for them, given that he refused to provide his address. Further, the Department did not know with whom N.H. was living. Villarreal further testified that N.H. had a prior criminal history of violating protective orders.

Claudia Rodriguez was the first Department case worker assigned to this case. Rodriguez explained that the Department creates a family plan of services for the parents with the goal of family reunification. The family plan is typically a collaborative effort by both the Department and family to coordinate needed or requested services, such as counseling or housing and job placement assistance. N.H. did not attend his conference. The Department, therefore, established the following plan for him: (1) cooperation with the Department; (2) drug assessments, including random drug testing; (3) employment; (4) a psychosocial evaluation; (5) housing; (6) regular visitations with the children; and (7) paying child support.

N.H. received this plan in the mail and discussed it with Rodriguez over the phone. He, however, failed to fully comply with the plan. For example, N.H.'s communication with the Department was inconsistent. He did not pay child support for his children. He

3

failed to provide accurate documentation of where he lived. Rodriguez testified that she visited a home that N.H. claimed was his, but she soon learned it was his ex-sister-in-law's home and that he did not live there. Regarding employment, N.H. provided one pay stub from where he was working but shortly thereafter changed jobs. Rodriguez did note, however, that she observed some of N.H.'s visits with his girls and that the girls and their father seemed to love each other and share a bond.

Rodriguez further testified that N.H. failed to appear for scheduled drug tests in February, June, and July of 2018. Rodriguez suspected that N.H. was doing drugs, though, based on some accidental text messages she received from him. On September 10, 2018, Rodriguez texted N.H. that she would "not be able to do a visit with [him] this Friday." N.H. responded, "Okay. Let me [k]now when your [sic] ready." Then, N.H. wrote, "Can u bring t[w]o grams on Staples and Morgan[,] the store?" The next text from N.H. read, "Of that glue PVC that[']s all I need[.] I have one more [p]ipe to glue." And the final text from N.H. stated, "Sorry wrong person trying [to] let my boss [k]no[w] that I need PVC." Rodriguez believed that N.H. was soliciting two grams of an illegal drug, as she knows that PVC glue is not measured in grams. On September 21, 2018—about ten days after those texts—N.H.'s hair follicle tested positive for cocaine.

Maria Garza, the second Department case worker assigned to this case, testified that N.H. only attended five out of eighteen potential visits with his children in the four months prior to trial. She, like Rodriguez, also reported that she was unable to verify N.H.'s home address, despite repeated requests for that information. Garza stated that N.H. further failed to attend his Battering Intervention and Prevention Program, which the

4

Department arranged for N.H. given D.R.'s assertions of past domestic violence and N.H.'s previous criminal history of violating protective orders. Finally, Garza reported that N.H. admitted using drugs when he was grieving his mother's death.

## B. Testimony from Counselors

Jinnelle Powell is a licensed professional counselor who contracts with the Department to provide counseling services. The Department arranged for N.H. to receive counseling from Powell, but she discharged N.H. twice due to his inconsistent attendance. According to Powell, N.H. only attended four out of fifteen scheduled sessions. Powell testified that, based on her psychosocial assessment, she believed N.H. might have Bipolar Disorder I. She was concerned about some of the "grandiose" ideas he shared in counseling: although he was unemployed, did not have stable housing, and did not have consistent contact with his children, he "felt he was a really great parent and that he was doing everything that he could to be a good parent."

Octavio "Toby" Flores is a licensed chemical dependency counselor. Initially, Flores only provided drug counseling to N.H., but eventually Flores's contract included anger management and parenting services as well. Flores testified that although N.H. initially denied drug use, he eventually admitted to it. N.H. shared with Flores that he used drugs to cope with the stress of not being with his children and also his mother's death. Flores did not believe N.H. had mental disabilities and testified that he hoped N.H. could be reunited with his children. Flores admitted, though, that N.H. did not have stable housing or employment and that those factors would be necessary to provide for the children.

5

**C.**     **Testimony from the Mother, D.R.**

D.R., M.R. and M.H.'s mother, testified that she has had seven children in her life.[4] D.R. testified that her main source of income was from disability benefits she receives for her anxiety, depression, and back problems.   Regarding the Department's case involving M.R. and M.H., D.R. admitted that there was a three-month period when she did not take her prescribed medications to manage her mental health, so she was not caring for the girls like she should.   She admitted to smoking marijuana in the past but denied using it within the last year.   She acknowledged posting drug-related updates on Facebook, however, such as "F--- love.   Get high" and "smoke weed at my funeral."   D.R. admitted taking her two young daughters to her father's house at one point when she did not have housing, even though D.R.'s father had sexually abused her as a child.   She explained that it "was the only place [she] had."

D.R. explained that she did not allow N.H. to be in his children's lives because he "was abusive."   She testified that "he was always hitting [her] and making [her] lip fat." She reported that he would strike her in the face, give her bruises all over her body, and break her phones.   D.R. also testified that he would yell at M.R. when she was a baby and crying.   D.R. was afraid N.H. would hit the girls.   She confirmed that he never paid child support to her for M.R. or M.H.

**D.**     **Testimony from Defendant, N.H.**

N.H. testified that D.R. and the girls used to live with him.   He admitted that he

---

[4]   Again, the record shows that the trial court terminated D.R.'s parental rights to her oldest five children, M.R., R.R., P.R., C.R., and B.R., and gave sole custody of them to their father.

would yell at D.R. because "she was always having my babies dirty or not taking them a bath." He denied ever being violent with D.R. and instead stated that she had once attacked him with a knife. N.H. testified he had six children total with three different mothers. The evidence showed that he twice violated a protective order against the mother of his three oldest children. The evidence also showed that he had been violent with the mother of his fourth-oldest child, a son with special needs.

N.H. testified that he tried to visit M.R. and M.H. while they were in foster care but could not always make the scheduled visitations. He listed the death of his mother, transportation issues, and a robbery of his home as the reasons for these missed visits. When he did visit with his daughters, he shared that he played with them, fed them, and hugged them. He stated, "they are babies" and he "show[ed] them a lot of love." He would bring them food, toys, and clothing.

N.H. testified that he has had four jobs since the Department's case began, doing air conditioning, plumbing, and electrical work. His current employer currently provides his housing. He shares this housing with fifteen other men and was "not going to take [his] kids there." He testified that if the court awarded him custody of his girls, he would move in with a female cousin who had a two-bedroom home in Rockport, Texas. He opined that his cousin and her young son would share one bedroom while he and his girls would share another.

N.H. explained that the reason he tested positive for cocaine was because he was smoking marijuana and "it was laced." He testified that he normally does not use drugs because his employers conduct random drug tests, but that he used cocaine after his

7

mother passed away. He explained, "I was depressed, I had drank a little bit, and I made a wrong choice, wrong decision. I'm not perfect." According to N.H., he was non-compliant with the Department's family plan because he was "being stubborn" and he "didn't feel like [he] should pay for [D.R.'s] mistakes." He believed that D.R. was the reason his daughters were in foster care, not him. He testified, "I don't see the importance of these classes getting done. For what? What is that going to change? I'm not the one that made the mistakes, and the reason we're here, I'm not that person, so why blame it on me or act like it was me?" N.H. did, though, acknowledge that the Court explained to him that following this family plan of service was what he had to do to get his daughters returned.

N.H. testified that D.R. used cocaine and marijuana and was unstable. He described her as going "in and out of these crazy states" and admitted that it was a mistake to leave his girls alone with her. Additionally, he acknowledged that he did not pay child support and blamed the attorney general for not taking it out of his paycheck. He also admitted to not paying child support for his older five children.

**E.    Testimony from the Foster Mother**

M.R. and M.H.'s foster mother, Sylvia Garcia, testified at trial. She stated that she has had the girls in her home for a year and two months. She has fostered nearly thirty children in her home over ten years.

Garcia reported that both girls arrived at her home with lice. M.H., a little over a year old when she arrived at her foster placement, was "very developmentally delayed." According to Garcia, she had poor trunk control. M.H. only sat and did not crawl or walk.

She also could not chew or swallow very well. Garcia stated that if she showed M.H. a toy, M.H. would not grab it like a normal baby.

M.R. was similarly delayed. Garcia testified that the little girl was "very fearful" and "anxious." She had a poor appetite and would constantly grab her stomach. Garcia had trouble changing her diaper because M.R. would get scared when Garcia got too close. Garcia reported that M.R. would flap her hands, would only babble and not talk, and did not know how to play: these characteristics caused Garcia to request that M.R. be tested for autism. M.R. was defiant at school and displayed learning difficulties.

Garcia reported that M.H.'s development now seems on target for her age. M.H. walks, talks, and is loving and affectionate with her older sister. M.R. still has anxiety and is defiant, but her health and development have improved. Garcia believes the girls should remain together. She states they "both need a place where they are going to be in an environment where they will be paid attention to so that they can thrive. They need to thrive." Regarding N.H., Garcia stated that M.R. is excited to see her father but M.H. does not know who he is and has no real connection to him.

## F. Testimony from the CASA Advocate

Alice McClintock was the Court-Appointed Special Advocate (CASA) in this case. She explained that she is a volunteer who is "an extra set of eyes and ears for the court" in child welfare cases. McClintock visited the girls at least once a month while they were in foster care and testified that she worked over two hundred hours on this case alone.

McClintock opined that she did not believe M.R. and M.H. should be returned to their father, N.H. She observed that "he has not . . . been able to provide a stable home

over the past year for the girls. He has not participated in the services very willingly or very consistently." She testified that she believed it was in the girls' best interests that N.H.'s parental rights be terminated. She stated, "these two little girls need a permanent, nurturing home."

After a four-day trial, the jury terminated both D.R. and N.H.'s parental rights to M.R. and M.H. N.H. appeals this decision.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

Given the fundamental rights at issue, due process requires that termination of parental rights be supported by clear and convincing evidence. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

Before parental rights may be involuntarily terminated, the trier of fact must find two elements by clear and convincing evidence: (1) that the parent committed one of the statutory grounds for termination found in § 161.001(b)(1) of the family code; and (2) that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012).

The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). In conducting a legal sufficiency review, the reviewing court cannot

10

ignore undisputed evidence contrary to the finding but must otherwise assume the factfinder resolved disputed facts in favor of the finding. *See In re J.F.C.*, 96 S.W.3d at 266. Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true. *Id.*

We perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). If, in weighing disputed evidence, the factfinder could have reasonably resolved the conflicts to form a firm conviction that the allegations constituting the grounds for termination were true, then the evidence is factually sufficient and the termination findings must be upheld. *See In re C.H.*, 89 S.W.3d 17, 18–19 (Tex. 2002). On the other hand, evidence is factually insufficient if the factfinder could not have formed a firm belief or conviction that the finding was true. *In re J.F.C.*, 96 S.W.3d at 266.

### III. BEST INTERESTS OF THE CHILDREN

#### A. Applicable Law

There is a strong presumption that the best interest of the child is served by keeping the child with a natural parent. *See In re E.D.*, 419 S.W.3d 615, 617 (Tex. App.—San Antonio 2013, pet. denied); *In re S.M.L.*, 171 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2005, no pet.). The burden is on the Department to rebut that presumption. *See In re E.D.*, 419 S.W.3d at 617. In reviewing the sufficiency of the evidence to support a best interest finding, we examine the following factors articulated

in *Holley v. Adams*: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *See* 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re S.M.L.*, 171 S.W.3d at 480.

This list is not exhaustive, nor is evidence required on all nine factors to support a finding terminating a parent's rights. *Holley*, 544 S.W.2d at 372; *In re S.M.L.*, 171 S.W.3d at 480. The State need not prove all of the *Holley* factors as a condition precedent to parental termination. *In re C.H.*, 89 S.W.3d at 27. Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child, but the presence of scant evidence relevant to each *Holley* factor will not support such a finding. *In re J.J.O.*, 131 S.W.3d 618, 630–31 (Tex. App.–Fort Worth 2004, no pet.) (citing *In re C.H.*, 89 S.W.3d at 27).

**B.    Analysis**

**1. Desires of the Child**

Regarding the first *Holley* factor, the children are too young to express where or with whom they would like to live. This factor is neutral regarding the best interest

decision.   *See Holley*, 544 S.W.2d at 371–72.

## 2. Emotional and Physical Needs

N.H. testified that he knew D.R. was unstable and abused drugs, and that it was a "mistake" to leave the girls with her.   Rodriguez, the first Department case worker assigned to the case, testified that the girls were removed from their mother's care because they were arriving to daycare unbathed, in dirty clothing, and that M.H.'s vaginal area had a "foul odor" even after daycare employees changed her diaper.   Garcia, the children's foster mother, reported that both children arrived at her home with lice.   M.H., only a year old, was "very developmentally delayed."   She had poor trunk control and did not crawl or walk.   She also could not chew or swallow very well.   Garcia testified that if she showed M.H. a toy, M.H. would not respond to it like a normal baby.   Now, however, after a year in foster care, M.H. has thrived.   She walks, talks, and is loving and affectionate with her older sister, M.R.

Garcia testified M.R. was "very fearful" and "anxious" when she was placed in foster care.   She had a poor appetite and would constantly grab her stomach.   M.R. would become afraid when Garcia would get close to change her diaper.   M.R. would flap her hands, babble incoherently, and did not know how to play, causing Garcia to request that M.R. be tested for autism.   M.R. was defiant at school and displayed learning difficulties.   At trial, Garcia reported that although M.R. still has anxiety and remains defiant, her health and development have improved.

In light of the foregoing evidence, we conclude that consideration of the girls' emotional and physical needs weighs heavily toward termination.

13

### 3. Emotional and Physical Danger

There was no evidence that N.H. ever abused his daughters; however, evidence suggested domestic abuse between him and his children's three mothers. N.H.'s criminal history also revealed that he had twice violated a protective order against the mother of his three oldest children. *See In re D.M.,* 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (holding that evidence of a parent's "inability to maintain a lifestyle free from arrests and incarcerations" was relevant to a best interest determination).

N.H. also testified that he knew that D.R. used illegal substances such as cocaine and marijuana. He described her as unstable and going "in and out of these crazy states." He admitted that it was a mistake to leave his girls alone with her. He also admitted to using cocaine himself. The foregoing evidence weighs in favor of termination.

### 4. Parental Abilities of N.H.

According to Rodriguez, N.H. seemed loving during his visits with the girls. N.H. himself testified that he played with, fed, and hugged his girls when he attended his scheduled visitations. He stated that "they are babies" and he "show[ed] them a lot of love." On the other hand, N.H. attended those visitations infrequently. N.H. did not have stable employment or housing, and in fact refused to give the Department accurate information about where he lived. He also admitted to never paying child support for any of his six children, including M.R. and M.H.

14

The contrasting evidence on this factor makes it neutral in our best interest determination.

### 5. Programs Available to Assist N.H.

This *Holley* factor considers assistance programs available to the person seeking to avoid termination. *See In re C.J.S.*, 383 S.W.3d 682, 694 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also Holley*, 544 S.W.2d at 371–72. During trial N.H. testified that he did not believe he needed to attend the parenting, anger management, or counseling classes the Department recommended. He stated, "I don't see the importance of these classes getting done. For what? What is that going to change? I'm not the one that made the mistakes, and the reason we're here, I'm not that person, so why blame it on me or act like it was me?" These facts weigh in favor of termination.

### 6. The Plans for the Child

N.H. stated that, if he received custody of his daughters, he would move in with his cousin who had a two-bedroom home in Rockport, Texas. He opined that his cousin and her young son would share one bedroom while he and his girls shared another. However, the evidence showed that at the time of trial he was living in a home with fifteen fellow male employees.

Department case workers Rodriguez and Garza both verified that N.H. refused to give an accurate home address while the case was pending. And N.H. admitted during his direct examination that he had had four jobs since the case was open. N.H.'s lack of stable housing and employment cause this factor to weigh in favor of termination.

15

## 7. The Stability of the Home or Proposed Placement

N.H., throughout his entire family plan of service, did not report where he lived or gave false information as to where he lived to the Department. At the time of trial, he lived in employer-provided housing that he shared with fifteen other adult males. He acknowledged that it was not an appropriate place for his toddler daughters and proposed to the court that he would move in with a female cousin who had a two-bedroom home. He also admitted that, in the span of a year, he had had four jobs.

In contrast, the girls' present foster care situation with Garcia was stable and loving. Although both girls had arrived to Garcia's home developmentally delayed, they were each making physical, emotional, and cognitive progress. According to Garcia, M.R. and M.H. "both need a place where they are going to be in an environment where they will be paid attention to so that they can thrive. They need to thrive."

N.H.'s inability to provide stable housing or maintain steady employment weighs in favor of termination.

## 8. Acts or Omissions of the Parent

The record showed that N.H. did not pay child support, did not attend counseling services, and did not attend all of his scheduled visitations. He had a criminal history of violating protective orders and of alleged violence in previous relationships. The evidence also showed N.H. abused illegal drugs, as one hair follicle test tested positive for cocaine. N.H. admitted to this drug use: he explained that he used cocaine after his mother passed away. He explained, "I was depressed, I had drank a little bit, and I made a wrong choice, wrong decision. I'm not perfect." These acts and omissions weigh in

16

favor of termination in our best interest analysis.

### 9. Any Excuse for the Parent's Acts or Omissions

At trial, N.H. testified, "I don't see the importance of these classes getting done. For what?   What is that going to change?   I'm not the one that made the mistakes, and the reason we're here, I'm not that person, so why blame it on me or act like it was me?" He believed that the girls were in foster care because of D.R.'s acts, not any acts of his own.   Further, he blamed his inability to make counseling or child visitations on his work schedule, his lack of transportation, and a robbery.   He blamed his cocaine use on the death of his mother, and he blamed the Texas Attorney General's office for not taking the money from his paycheck for child support.   These facts weigh in favor of termination.

### 10. Summary

Viewing the evidence in the light most favorable to the verdict and considering undisputed contrary evidence, we conclude that a reasonable factfinder could form a firm belief or conviction that terminating N.H.'s parental rights was in M.R. and M.H.'s best interests.  *See In re J.F.C.*, 96 S.W.3d at 266.   Although N.H. seemed to be attentive to his girls when he was with them, he exercised his visitation infrequently.   This, combined with his drug use, decision to leave his daughters with a neglectful mother with a drug problem, failure to pay child support or comply with the family plan, past criminal history, and unstable job and housing situation supports the decision to terminate.   *Id*.   This evidence is also sufficient to establish a firm conviction in the mind of the trier of fact that termination was in the children's best interest.  *See In re C.H.*, 89 S.W.3d at 18–19.   We overrule N.H.'s first issue.

17

## IV. STATUTORY FINDINGS

### A.    Applicable Law

In addition to a best interest finding, the trier of fact must find that the parent committed one of the statutory grounds found in § 161.001(b)(1) of the Texas Family Code by clear and convincing evidence before terminating parental rights. *See* TEX. FAM. CODE ANN. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). In N.H.'s case, the jury found that N.H. violated §§ 161.001(b)(1)(D), (E), (F), (N), and/or (O):

> (D)    knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

> (E)    engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

> (F)    failed to support the child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition;

> . . . .

> (N)    constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the [Department] for not less than six months, and:

>> (i)    the department has made reasonable efforts to return the child to the parent;

>> (ii)    the parent has not regularly visited or maintained significant contact with the child; and

>> (iii)    the parent has demonstrated an inability to provide the child with a safe environment; and

> (O)    failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing

18

conservatorship of the [Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

TEX. FAM. CODE ANN. § 161.001(b)(1)(D)–(F), (N), (O).

**B.    Analysis**

We analyze the first two findings—(D) and (E)—together.   The jury found that N.H. "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child."   TEX. FAM. CODE ANN. § 161.001(b)(1)(D).   The jury also found that N.H. "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child."   *Id*. § 161.001(b)(1)(E).

"Both subsections D and E of [§] 161.001(1) use the term 'endanger.'   'To endanger' means to expose a child to loss or injury or to jeopardize a child's emotional or physical health."   *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (citing *In re M.C.,* 917 S.W.2d 268, 269 (Tex. 1996); *Walker v. Tex. Dep't of Family & Protective Servs.,* 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)).   "Endangerment under subsection D may be established by evidence related to the child's environment."   *In re S.R.*, 452 S.W.3d at 360. "'Environment' refers to the acceptability of living conditions, as well as a parent's conduct in the home."   *Id*.   "Under subsection E, the evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act."   *Id*.

The record shows N.H. knew that D.R. used cocaine and marijuana.   He described D.R. as unstable and going "in and out of these crazy states."   He

19

acknowledged that it was a mistake to leave his girls alone with her but failed to remove them that environment. When the Department removed the girls from their mother's house, both M.R. and M.H. had lice in their hair and regularly went to daycare unbathed and in soiled clothing. M.H. had a foul vaginal odor that persisted even when she had a fresh diaper. Further, according to their foster mother Garcia, both children were physically, emotionally, and cognitively delayed in their development.

Viewing the evidence in the light most favorable to the verdict and considering undisputed contrary evidence, we conclude that a reasonable factfinder could form a firm belief or conviction that N.H. placed his daughters in conditions that endangered their physical or emotional well-being and engaged in conduct that endangered their physical or emotional well-being. *See In re J.F.C.*, 96 S.W.3d at 266; *see also* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (E). Thus, we conclude there is legally sufficient evidence to support these findings. *See In re J.F.C.*, 96 S.W.3d at 266. This evidence is also sufficient to establish a firm conviction that the findings are true. Accordingly, we conclude there is factually sufficient evidence to uphold these findings. *See In re C.H.*, 89 S.W.3d at 18–19.

Having determined that the evidence is sufficient to support the trial court's findings on the (D) and (E) statutory grounds, we need not consider whether the evidence would support subsections (F), (N), or (O)—the other grounds for termination. *See In re A.V.,* 113 S.W.3d 355, 362 (Tex. 2003) (affirming a termination decree based on one predicate without reaching the second predicate found by the trier of fact and challenged by the parent). We overrule N.H.'s second issue.

20

## V.  Ineffective Assistance of Counsel

### A.    Applicable Law

"To successfully assert a challenge of ineffective assistance of counsel, a defendant in a parental-rights termination case must show that his or her counsel's performance was deficient and that this deficiency prejudiced the defense." *Walker*, 312 S.W.3d at 622–23 (citing *In re J.P.B.,* 180 S.W.3d 570, 574 (Tex. 2005)).  "This standard requires a showing that counsel's errors were serious enough to deprive the defendant of a fair trial whose result is reliable." *Strickland v. Washington,* 466 U.S. 668, 687 (1984). "There is a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance, including the possibility that counsel's decision was based on strategy." *In re M.S.,* 115 S.W.3d 534, 549 (Tex. 2003) (citing *Strickland,* 466 U.S. at 689).

In deciding whether counsel's performance is deficient, we must consider all of the circumstances surrounding the case and focus primarily on whether counsel performed in a "reasonably effective" manner. *M.S.,* 115 S.W.3d at 545 (citing *Strickland,* 466 U.S. at 687–88).  When there is no record explaining why counsel engaged in the challenged conduct, it is only when the conduct was "so outrageous that no competent attorney would have engaged in it" that the challenged conduct will constitute ineffective assistance. *M.S.,* 115 S.W.3d at 545.

If a reviewing court concludes that the conduct of trial counsel was deficient, the court must then determine if that conduct was prejudicial to him by assessing whether "'there is a reasonable probability that, but for counsel's unprofessional error(s), the result

21

of the proceeding would have been different.'" *Strickland,* 466 U.S. at 694. *Strickland* 's appellate record requirement applies to ineffective assistance challenges in termination cases: "'An allegation of ineffective assistance must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness.'" *In re K.K.,* 180 S.W.3d 681, 685 (Tex. App.—Waco 2005, no pet.). An ineffectiveness challenge fails if the defendant does not make the required showing of either deficient performance or sufficient prejudice. *See Thompson v. State,* 9 S.W.3d 808, 813 (Tex. 1999).

## B. Analysis

N.H. complained that his attorney's failure to object to the jury charge submission of a single broad-form termination question listing multiple potential grounds for termination rendered his counsel's representation ineffective. N.H. argued the charge "did not require ten (10) of the twelve (12) jurors to determine whether [he] had violated any particular provision" of Texas Family Code § 161.001. *See* TEX. FAM. CODE ANN. § 161.001 *et. al*.

In *Texas Department of Human Services v. E.B*., the Texas Supreme Court held that the submission of a single broad-form termination question listing multiple potential grounds for termination did not violate a parent's due process rights. *See* 802 S.W.2d 647, 649 (Tex. 1990); *see also In re R.G.B*., No. 13-17-00187-CV, 2017 WL 3769159, at *3-4 (Tex. App.—Corpus Christi–Edinburg Aug. 31, 2017, no pet.) (mem. op.). The high court in *E.B.* concluded that "the controlling question in this case was whether the parent-child relationship . . . should be terminated, not what specific ground or grounds . . . the

22

jury relied on to answer affirmatively the questions posed." *See E.B.*, 802 S.W.2d at 649. The court further held, "[b]road-form questions reduce conflicting jury answers, thus reducing appeals and avoiding retrials." *See id.*

We conclude that N.H.'s attorney's decision not to object to the submission of a single broad-form termination question listing multiple grounds for termination was within the range of objective, reasonable professional assistance, given the Texas Supreme Court precedent allowing such jury instructions. *See Strickland*, 466 U.S. at 689. Further, considering the evidence supporting the best interests holding and the termination grounds, we conclude that the result of the proceeding would not have been different but for this alleged error. *See Thompson,* 9 S.W.3d at 813. Accordingly, we overrule N.H.'s third issue regarding ineffective assistance of counsel.

## VI. CONCLUSION

We affirm the trial court's judgment.

LETICIA HINOJOSA
Justice

Delivered and filed the
30th day of August, 2019.

23